IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 12, 2016 Session

**STATE OF TENNESSEE v. HENRI BROOKS**

**Appeal from the Criminal Court for Shelby County**
**No. I1500012        Paula L. Skahan, Judge**
_____

**No. W2015-00833-CCA-R3-CD  -  Filed February 27, 2017**
_____


The Defendant, Henri Brooks, entered a guilty plea to a charge of making a false entry on an election document, a Class D felony. The Defendant, who was completing a term as a County Commissioner for Shelby County at the time of the offense, listed an incorrect address on a document related to her bid for the position of Shelby County Juvenile Court Clerk. The trial court held a sentencing hearing during which the primary contested issue was the Defendant's request for judicial diversion. The trial court ultimately denied diversion and instead sentenced the Defendant to two years of probation. On appeal, the Defendant argues that the trial court abused its discretion in denying diversion because it failed to weigh the factors it was required to consider in denying diversion, because it relied on improper evidence in making the decision, and because the denial was in part based on the Defendant's exercise of her First Amendment rights. After a thorough review of the record, we conclude that the trial court improperly relied on evidence outside the record in reaching its decision. Accordingly, we reverse the denial of diversion, and we remand for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

André C. Wharton and Michael Ryan Working, Memphis, Tennessee, for the appellant, Henri Brooks.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Garry Brown, District Attorney General, pro tem; and Jason Scott and Mark C. Hazlewood, Assistant District Attorneys General, pro tem, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The evidence in the record shows that the Defendant has a long history of public service in Memphis and that she is primarily known for fighting for justice for the poor, particularly within the African American community. After holding elected office and otherwise working within the State and County governments, the Defendant was elected to the position of County Commissioner in 2006, reelected in 2010, and continued to hold that office through 2014. In 2010, the Defendant's daughter sustained a serious injury, and the Defendant began to stay with her daughter's family to help care for her daughter and grandchildren. Beginning in 2010 and continuing through 2014, the Defendant filed several campaign finance documents and one petition to run for Juvenile Court Clerk, all of which listed an address belonging to the Defendant's friend as her residence. She ultimately entered a guilty plea, pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to one count of making a false entry on an election document.

The Defendant presented numerous character witnesses, all prominent members of the community, who testified about the lasting value of her work in public service and who detailed her many achievements. The Defendant takes issue with two events which also became a focus of the hearing: a dismissed assault case against the Defendant, in which she allegedly threw water on a woman, and an argument during a County Commission meeting, in which she made certain statements to a Hispanic man regarding diversity in contracts. The Defendant challenges the trial court's weighing of the factors relevant to judicial diversion. She contends that the trial court improperly considered evidence outside of the record in the assault case and regarding the County Commission meeting. She argues that her actions in the Commission meeting were protected political speech and that the trial court violated her First Amendment rights in considering them. Because we conclude that the trial judge erred in relying, among other things, on the trial judge's personal recollection of television news accounts of the assault case and County Commission meeting, we reverse and remand for a new sentencing hearing.

### Sentencing Hearing

At the sentencing hearing, the prosecutor pointed the trial court to a Statement of Undisputed Facts which the State had filed. The defense did not dispute that it had stipulated to the facts in the document. According to the Statement of Undisputed Facts, the Defendant first began to list the address in question as her home address in 2010, and she twice voted listing it as her home address. The Defendant also listed the address on eight campaign finance disclosure statements while she was County Commissioner, and these documents were filed on October 26, 2010; July 25, 2012; July 8, 2013; July 15,

2013; December 9, 2013; December 31, 2013; April 15, 2014; and May 19, 2014. On February 18, 2014, the Defendant listed the address as her home address on a petition to run for Shelby County Juvenile Court Clerk, and this filing is the basis for the conviction at issue in this appeal.

The Statement of Undisputed Facts recites that the Defendant never had an ownership interest and never had utilities in her name at the address she listed on the petition for the County Clerk position. The defense stipulated that the owner of the home, Robert Robin Brown, would testify that the Defendant did not reside at the address. Mr. Brown, in an interview with agents from the Tennessee Bureau of Investigation ("TBI"), stated that he had managed two of the Defendant's campaigns in the years prior to his wife's death in 2010. After the death of his wife, he and the Defendant had a "close friendship / relationship." According to Mr. Brown, the Defendant then lost her house due to financial troubles and asked him to use his address to receive mail. Mr. Brown's statement to the TBI was that "[s]he used it as an address of record, but she never lived here." According to Mr. Brown, the longest the Defendant stayed was overnight, and their relationship only lasted "a couple of weeks." Mr. Brown stated that he would inform the Defendant when he received mail addressed to her, and if she did not retrieve it, he would forward it to the County Commission. While the defense did not stipulate to the truth of Mr. Brown's assertions, it stipulated that he would testify consistently with this statement to the TBI. According to filings in the technical record made by the State and by the Defendant, Mr. Brown's address was within the Defendant's district as a Commissioner, while the address of her daughter, where she was staying, was not. Both addresses were within Shelby County, as required for the Juvenile Court Clerk position.

The Defendant called numerous witnesses to testify to her character and contributions to the community. The exhibits in the appellate record from the hearing also include letters attesting to the Defendant's character.

Mr. Michael Kernell served as a State Legislator with the Defendant, and they shared a suite and worked on a committee together in the Legislature. Mr. Kernell testified that the Defendant was industrious and more involved than many other Legislators. She helped to create some government oversight of employment practices under Title VI of the Civil Rights Act. Mr. Kernell testified that the Defendant was not a danger to the community, that she had good physical health, that she had no improper dealings as a Legislator, and that he had never known her to use drugs.

Mr. Willie Marshall Parks had known the Defendant since she was a teenager, and the two worked together for eleven years in the juvenile court system. The Defendant, who worked with neglected and dependent children, had a good work ethic and was

-3-

always passionate. Mr. Parks testified that "[e]verybody loved Commissioner Brooks." The Defendant also worked outside her district because "she had a love" for it. She had not had any problems with alcohol, drugs, or her mental health while she worked for the juvenile court system. According to Mr. Parks, she had had an impact on the community and had always been compassionate. While many of the witnesses made only oblique references to the Defendant's impact on the juvenile justice system, an exhibit to the record recounts that she filed a complaint with the Department of Justice ("DOJ") regarding disparate treatment of juveniles based on race in Shelby County and that the DOJ conducted an investigation and found constitutional violations within the juvenile court system, leading to reform.

Pastor L. LaSimba Gray, Jr., had known the Defendant since the 1980s, and he testified that she was always "committed and dedicated to a cause." Pastor Gray testified that she fought the "battle" in juvenile court "almost by herself." The Defendant was known for community advocacy and "always working on behalf of a cause." Pastor Gray testified that her legal troubles had "traumatized" her and that her case was in his opinion ideal for diversion, since justice would not be served by her incarceration or probation. Pastor Gray summarized that "one moment of collapse or failure cannot erase all the good she's done in this State and for the good of people."

Judge Joseph B. Brown, Jr., best known for conducting an arbitration show on television called The Judge Joe Brown Show, testified that he had also been a prosecutor, public defender, in private practice, part of the capital defense team, and ultimately, an elected judge in criminal court in Shelby County. Judge Brown had known the Defendant since the 1970s and found that she was "unflaggingly dedicated to improving a lot of people in this County, irrespective of ethnicity, race, or gender." Judge Brown testified the Defendant was an "unsung hero," who had focused on "wrongs that need to be corrected." The Defendant had worked for juveniles and was a conscientious mother. He had never observed her to have mental health issues. Judge Brown testified that she was "selfless" and "dedicated," observing that "[s]he could have made a lot of money in the world but she chose to spend the time helping people out."

Judge Brown testified obliquely regarding some threats the Defendant had faced. Judge Brown stated that the Defendant had faced personal danger as a result of her public service, including threats which the TBI found credible during her time in the Legislature. A stalker required her to move from her home downtown, and the stalking continued to the present. Judge Brown testified, "And she discussed with me what some might have taken as paranoia about this last individual or individuals finding where she had gone to, and that resulted in gun[]fire and damage to the premises she had been occupying shortly before the last incident…." The incident with gunfire was not further

explained in the record. He testified that the Defendant was under stress due to these incidents and was worried that she would endanger her family.

Commissioner Walter Bailey testified that he had served on the County Commission for forty-three years and had known the Defendant for thirty years. The Defendant was a public servant with "an enormous amount of passion and commitment," courage, and intelligence. She was an advocate for the poor and defenseless. Commissioner Bailey testified that her conviction was "a great tragedy." The Defendant was experiencing a great deal of stress as a result, but was mentally "quite balanced." He testified that the Commission discussed the contours of the residency requirement in the wake of the charges against the Defendant but did not discuss abolishing residency.

Mr. Randy Wade, who worked in the Sheriff's Department for twenty years and then as district director for a United States Congressman, had known the Defendant since around 1980. In the 1980s, the Defendant assisted Mr. Wade with a program to warn children to stay away from strangers. The Defendant acted as a liaison by setting up meetings, and she did this on a strictly volunteer basis. When the Defendant chose to leave her position in the State Legislature to run for local office, the community felt "jubilation because we knew as a people that we would have a voice." Mr. Wade stated that her legal situation "weighed heavily" on her. The Defendant was a "champion of poor people, the downtrodden," and Mr. Wade had encouraged her to fight her legal troubles rather than give up.

Pastor Leonard Dawson had been a pastor at Memphis Cane Creek Baptist Church for thirty-three years and had known the Defendant approximately ten years. The Defendant had "single handedly" instigated the reform of the juvenile justice system, and she always worked for the constituents in her district, where his church was located. Pastor Dawson stated that the Defendant "has repeatedly been willing to put herself at peril in order to do the things that would advance her people," and noted that by "her people," he meant those who are disadvantaged. The Defendant had carried herself professionally in the face of a stressful situation which included problems with her daughter's health.

The Defendant introduced two police reports from May 2010 related to her troubles with a stalker. The reports reflect that, when the Defendant went to sit on her porch at night, the lights of another apartment turned off and then a bright light was focused on her and followed her movements. This occurred on two occasions. On a separate occasion, she saw a man watching her from the same apartment.

During the hearing, defense counsel alluded to "some very private problems" which the Defendant had experienced and which he was not sure she would share. It is not clear if these problems were ever shared with the court.[1]

The Defendant addressed the court, acknowledging the "seriousness of the situation that brings me before the Court." However, she noted that the Commission has, since the charges, struggled and failed to define the residency requirement. She stated that she was entering a plea to allow the court to turn its attention to matters of public safety. The Defendant explained her change in address by stating that her daughter had become totally incapacitated as the result of an injury, that her daughter's recovery was longer than expected, and that she chose to take care of her daughter and grandchildren during this time, while still serving the constituents of her district. The Defendant stated, "I really struggle tremendously with the idea that I am a criminal for serving my family's needs." She elaborated, "I struggle with the fact that my crime is one of staying with my family in the wrong part of the County while I was serving the people of the entire County." She noted that she received no monetary benefit from the crime, acknowledging that her pension may have been endangered by her conviction but stating that her pension "never crossed my mind." She stated she wanted to continue to work for the community as a private citizen.

After the Defendant's allocution, the trial court noted that it was obliged to consider the Defendant's criminal record and noted that the presentence report did not contain an account of the Defendant's arrest for assault. The prosecutor gave an account of the alleged assault, which took place prior to the investigation into the false statements on the election documents. The prosecutor recited that on June 10, 2014, the Defendant allegedly threw water on Lisa Nichols, the victim, after an argument in a parking lot. The assault charge was ultimately dismissed as part of the plea agreement in this case.

---

[1] At one point, defense counsel stated:

> I just wanted to show this to the Court to the extent we could have some kind of Protective Order. I know it's not introduced but I just wanted to give Your Honor a perspective on something.
>
> Her daughter is here, she's being seen by a therapist. The therapist – not get too involved to the extent it may trigger – she's apparently kind of volatile in terms of her condition and she was worried about the impact.

The trial court apparently referenced the document later, stating, "But reading this about her daughter[,] it's sad." This court is left to guess what additional evidence the trial court considered and whether the Defendant intentionally sought to omit this from the record.

The trial court then noted the importance of the Defendant's work in the community and that "getting the Justice Department to come down here and do what they needed to do was just outstanding." The court stated, however, that it was difficult to overlook the assault "allegedly, you know, throwing water from a water bottle on someone and saying what do you think you're white, you know. Whatever it was, you know, at somebody it's just bizarre." This was the first reference in the record to the Defendant's words to the victim in the assault case.

Defense counsel then noted that the victim of the assault had "some issues apparently," and he introduced two police reports filed by the victim to show that the victim may have been at fault in the incident. In one, the victim alleged that a man had chased her around a dollar store and sprayed her with a spray bottle of bleach and that this act was related to some online harassment. In another police report, the victim reported a theft at her house on two separate occasions. Defense counsel noted that the Defendant had been harassed for her political activities and that the harassment affected her actions when the victim came up to her in a parking lot and spat on her. The court responded, "I thought there was a disinterested bystander taking photos." When defense counsel stated that there was a video showing a security guard asking the victim to back away, the court stated, "That's not what I remember." Defense counsel objected to the trial judge's reliance on her memory of the video as hearsay.

The prosecutor then gave further detail on the incident, stating that the victim's version of events was that she was trying to back into a parking spot and that the Defendant took the spot as she was backing up. The victim "ended up hitting a tree." The prosecutor then acknowledged that the victim approached the Defendant but stated that the Defendant was "irate" and told the victim "you think you can do that just because you're white, or something along those line[s]." The Defendant then allegedly threw water on the victim.

The defense decided to introduce the Defendant's testimony regarding the incident. The Defendant stated that her car was already parked when she noticed the victim. The victim's car backed into an area next to the Defendant's, and the victim went back and forth with her car, hitting a small tree three separate times. The Defendant at first thought the victim was backing into a parking space, but then she realized that the area next to her was not designated for parking. The Defendant's dashboard camera recorded the event. While there was some discussion regarding formatting this recording to make it an exhibit, defense counsel ultimately chose not to do so. Several photographs, showing the victim's car several feet past the curb and apparently against a small tree, were introduced. The Defendant testified that the victim then approached her, shouting, asked if she was a judge, and spat on her. The Defendant splashed the victim with water to make her leave.

In response, the State introduced the statement of a witness, Erma Perry, who told police that she saw "the white lady being forced onto the curb." Ms. Perry stated that the victim confronted the Defendant, who was leaving her vehicle. The witness stated that the Defendant then threw water on the victim and said, "you just acting that way cause you're white." The victim then claimed to be a "child of God" and called the Defendant the devil. The Defendant attempted to leave but was blocked by a gray car. Defense counsel objected that the assault charge had not been subject to discovery and that he had not had an opportunity to interview the witness or to cross-examine her.

The trial court interjected, "Again, if I recall correctly from last summer the video showed water being thrown." Defense counsel stated that he did not recall that on a video and objected, citing the rule against hearsay. The Defendant then again addressed the court, elaborating that the victim had contacted an acquaintance who used a vehicle to block the Defendant in.

The trial court stated, "I think Ms. Brooks has some mental issues, I really do. I mean you're saying – stalking her daughter. She certainly doesn't admit to any – I mean, she went off in that meeting to the Hispanic guy. This incident in the parking lot is not typical. It usually takes two to have a fight like that. I'm just saying I think she's got some issues." At this point in the hearing, neither party responded to the trial court's sua sponte reference to the County Commission meeting.

Defense counsel offered to have the Defendant undergo a mental evaluation. The trial court expressed surprise that the Defendant's witnesses felt she had made one mistake, whereas the trial court found a pattern of erratic behavior. The trial judge stated that she was "leaning against diversion based on this whole craziness, the car." However, the court stated it would consider diversion if the Defendant were willing to have an in depth evaluation because "I can't believe she's not at least bipolar, probably more than that." The trial judge speculated that the Defendant "may be paranoid schizophrenic" and found she had "some rage issues" but acknowledged that that the trial judge was "not a licensed psychologist or whatever." The trial judge noted that she had also been threatened as a public figure but had dealt with it professionally.

The trial court then announced it would deny diversion and would sentence the Defendant to probation. The trial court went through the factors it had to consider in denying diversion. Regarding amenability to correction, the trial court found that the Defendant had apologized but had "some hesitancy in owning up" to her mistakes and "clearly does not feel that she did anything wrong in this assault charge." The court stated that the Defendant was not at risk for reoffending but that she should have taken responsibility for her actions.

Regarding the circumstances of the offense, the trial court found that there was "no excuse" for listing a false address, and it noted that the Defendant had held public office on prior occasions and was not filing for the first time. The trial court noted the Defendant had no criminal record but had a prior arrest.

Regarding social history, the trial court acknowledged that the Defendant had "done as much as about anybody can to fight for African-Americans." The trial court went on:

> But God help the Hispanic Americans as we heard last year her blast a man that was looking for assistance. She gave him an ear[ful] that just sent chills down my spine. You know, they're people too, and I think our representative should represent every one in our community, and I sense that Ms. Brooks has had a problem with that over the years.
>
> But she's had a chip on her shoulder about that, but she has been as stalwart champion of African-Americans as there could be and their community is very proud of her and many of us are very proud of her for what she has done for them. So kudos for that.

The trial court then stated that it had "questions" about the Defendant's mental health. The trial court noted that the Defendant was "caught on video tape fighting with somebody." It concluded that the Defendant had "some serious issues going on mentally."

The trial court found that deterrence was not a factor more than for any other crime. It concluded that diversion would not serve the interest of the public. The trial court sentenced the Defendant to two years of probation and ordered her to be assessed by a mental health professional, take any prescribed medications, and perform eighty hours of community service.

Defense counsel then objected to the trial court's consideration of the evidence regarding the Defendant's dispute with a Hispanic man during a Commission meeting. Defense counsel noted that the Defendant had not had a chance to respond to this proof and offered her testimony as "an offer of proof or … motion to reconsider." The Defendant testified that the video from the meeting, which was apparently shown on television, did not capture the context of her comments. The Defendant stated that the Commission had already rejected a certain resolution three times due to a lack of diversity. She stated that she was responding to the off-camera and "ugly" comments of the other Commissioners and that her "button got pushed." The Defendant testified that she had said that "our situation, meaning black people, is not comparable to yours, …

because when you talk about enslavement it's different." She told the court that she had apologized to the man she addressed at the meeting as well as to the Latino community in Memphis.

The trial court took the defense motion as a motion to reconsider. It stated that the Defendant committed many separate acts of listing a false address, and it noted that if she was motivated by fear of a stalker, she could have filed her real address under seal. Then the court referred again to the assault in the parking lot. The trial court concluded that "a message needs to be sent" to other public officials and concluded that the ruling denying diversion would stand.

## ANALYSIS

The Defendant argues that the trial court abused its discretion in denying diversion based on several alleged errors. The Defendant takes issue with the trial court's weighing of the requisite factors. She also asserts that the trial court erred in considering facts outside the record in making its decision, in particular the assault allegation, the County Commission meeting, and the Defendant's mental health. In a related issue, the Defendant contends that the trial court's consideration of her mental health and the County Commission meeting was based on unreliable hearsay. The Defendant also claims that considering the Defendant's statements during the Commission meeting violated her constitutional right to free speech.

When a qualified defendant pleads guilty or nolo contendere to certain designated felonies, the trial court may defer proceedings and place the defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A) (2013). A qualified defendant may not have a previous conviction for a felony or a class A misdemeanor requiring confinement or have been previously granted diversion. T.C.A. § 40-35-313(a)(1)(B)(i)*(d)*, *(e)*. "If the accused successfully completes the requisite probationary period, the trial court is required to discharge the accused and dismiss the proceedings," and the offender's record may be expunged. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The effect of expungement is to restore the defendant to the position occupied prior to arrest. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). If the probationary period is not successfully completed, then judgment is entered and a sentence is imposed. *Id.* Judicial diversion is a "legislative largess," and eligibility for diversion does not give rise to entitlement to diversion. *Id.*

In determining whether to grant or deny diversion, the trial court must consider: (a) the accused's the amenability to correction; (b) the circumstances of the offense; (c) the accused's criminal record; (d) the accused's social history; (e) the accused's physical and mental health; (f) the deterrence value to the accused as well as others; and (g)

whether judicial diversion will serve the interests of the public as well as the accused. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *Parker,* 932 S.W.2d at 958. The trial court must also weigh these factors against one another and provide an explanation of its decision regarding diversion on the record. *Electroplating, Inc.*, 990 S.W.2d at 229; *King*, 432 S.W.3d at 326. These requirements were not abrogated by the changes in our review of sentencing decision articulated in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). *King*, 432 S.W.3d at 326.

When the trial court trial has followed the procedure mandated by *Parker* and *Electroplating*, the court's decision to grant or deny pretrial diversion is reviewed for abuse of discretion, accompanied by a presumption of reasonableness. *Id.* at 327. Generally, a trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will apply a presumption of reasonableness and uphold the trial court's ruling so long as there is any substantial evidence to support the trial court's decision. *State v. Dycus*, 456 S.W.3d 918, 930 (Tenn. 2015). "[E]ven though an abuse of discretion standard of review is appropriate for a trial court's judicial diversion decision, the trial court must consider and discuss each of the *Parker* and *Electroplating* factors on the record before the appellate court can determine whether 'any substantial evidence' exists to support the decision." *King*, 432 S.W.3d at 327. The trial court is not, however, required to "recite" the factors; it is sufficient if the record reflects that each factor was considered. *Id.* However, if the trial court does not consider the appropriate factors delineated in *Parker* and *Electroplating* or does not place its reasons for granting or denying diversion on the record, then "presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for 'any substantial evidence' to support the trial court's decision, is not appropriate." *Id.* Instead, the appellate court may, in its discretion, either review de novo or remand for reconsideration. *Id.* at 328. In determining whether to remand or review de novo, the appellate court considers the adequacy of the record, the fact-intensive nature of the inquiry, and the ability of the court to request supplementation. *Id.* (determining that de novo review was appropriate).

Reliance on an irrelevant factor may also constitute an abuse of discretion. Because judicial and pretrial diversion are granted or denied based on the same relevant factors, the two are "subject only to the *same constraints*." *Id.* at 327 (quoting *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992)) (emphasis provided in *King*). Accordingly, the "obvious corollary" to the requirement that relevant factors be considered is the requirement that irrelevant factors must not form the basis of a decision regarding diversion. *State v. McKim*, 215 S.W.3d 781, 787 (Tenn. 2007). Merely considering an irrelevant factor will not warrant a finding of abuse of discretion; "it is the

*undue* consideration of an irrelevant factor that is prohibited." *Stanton v. State*, 395 S.W.3d 676, 687 n.2 & 691 (Tenn. 2013) (concluding that consideration of legislation which was proposed but not passed was not relevant but that the evidence was not given undue consideration); *see also State v. Chyanne Elizabeth Gobble*, No. E2014-01596-CCA-R3-CD, slip op. at 14 (Tenn. Crim. App. Aug. 12, 2015).

Initially, we note that while the State conceded at the trial level that the Defendant was a "qualified defendant" within the meaning of the statute, it nevertheless insinuates, in a footnote on appeal, that the Defendant may not be a "qualified defendant" because the term excludes defendants who commit certain offenses, including "any offense committed by any elected or appointed person in the executive, legislative or judicial branch of the state or any political subdivision of the state, which offense was committed in the person's official capacity or involved the duties of the person's office." T.C.A. § 40-35-313(a)(1)(B)(i)*(b)*. We note that the crime to which the Defendant pled guilty was the filing of a false address as part of the Defendant's bid for the position of Juvenile Court Clerk, a position that she did not ultimately win. This filing does not appear to have been undertaken as part of the Defendant's official capacity as a County Commissioner, nor did it involve the duties of a County Commissioner. In any event, we conclude that, in so far as this argument is raised by the State, it has been waived, both by failure to present it to the trial court and by failure to cite to adequate legal authority on appeal. *See* Tenn. R. App. P. 36(a); *State v. Hester*, 324 S.W.3d 1, 80 (Tenn. 2010) ("A reviewing court may deem an issue waived when a party fails to develop an argument in support of its contention or merely constructs a skeletal argument.").

## I. The Trial Court's Weighing of the *Electroplating* Factors

The Defendant argues that the trial court failed to assign weight to the *Parker* and *Electroplating* factors it considered in denying diversion. The State asserts that the record is sufficient to determine what weight the trial court assigned each factor, noting that in its opinion, the determinative factor appeared to be the Defendant's refusal to acknowledge wrongdoing, which the court determined reflected poorly on her amenability to correction. The State argues that the trial court placed on the record its reasons for denying diversion.

The trial court is not required to "recite" all of the factors or use "magic words" when explaining its decision regarding diversion. *King*, 432 S.W.3d 316, 327 & n.8. However, "the trial court must consider and discuss each of the *Parker* and *Electroplating* factors on the record" in order for the reviewing court to determine if any substantial evidence supports the decision. *Id.* at 327. "[T]he record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it." *Id.* The trial

-12-

court "must weigh the factors against each other and place an explanation of its ruling on the record." *Id.* at 326. We address the Defendant's argument that the weight assigned to the various factors was in error because the finding of the factors was not supported by the evidence as part of the analysis regarding whether the trial court relied on improper evidence.

The trial court examined each of the *Parker* and *Electroplating* factors in the record. It found that the Defendant was unlikely to reoffend but also had not accepted responsibility for the crime; that the offense was deliberate; that the Defendant had no prior criminal history; that the Defendant's positive social history was tempered by the events of the County Commission meeting; that the Defendant had serious mental health issues; that the need for deterrence was not great; and that diversion would not serve the public interest. The trial court did not explicitly state which factors were accorded the greatest weight in its decision. However, it can be inferred from the discussion in the record that the trial court weighed the Defendant's unwillingness to take responsibility for her offense, the circumstances of the crime, her social history, and in particular, her mental health against the granting of diversion. The trial court did not assign a mathematical weight to each factor, but discussed certain factors more exhaustively in imposing judgment. Insofar as the Defendant challenges the trial court's consideration of the appropriate factors and the trial court's compliance with the procedure requiring an explanation of its ruling on the record, we conclude that the trial court substantially complied with the procedures outlined in *King*.

The Defendant also challenges the trial court's failure to make an explicit finding regarding whether diversion would serve the Defendant's best interest, citing to *State v. Hammersley*, 650 S.W.2d 352 (Tenn. 1983). In *Hammersley*, the defendant was denied pretrial diversion because the prosecutor had decided that diversion should not be available in larceny cases. *Id.* at 356-57. The Tennessee Supreme Court concluded that the refusal to consider the defendant's personal merits and reliance on the sole factor of deterrence amounted to error. *Id.* at 357. We find *Hammersley* to be inapposite. The trial court here clearly considered the Defendant's individual circumstances in its evaluation. While it did not recite the "magic words" regarding what would be in the Defendant's best interest, the record shows that the trial court considered this factor, noting at one point that the trial judge believed there was "really something wrong with her" and that the court had "sympathy and empathy for people like that, and if I feel like I can help them I'd like to look into it." We conclude that while the trial court did not, when it imposed judgment, recite this particular factor, the record as a whole shows that this factor was considered in reaching the decision regarding diversion.

The Defendant takes issue with the trial court's reliance on its finding that the Defendant never acknowledged wrongdoing. The Defendant suggests that allowing the

-13-

court to consider the failure to admit guilt is incompatible with the availability of an *Alford* plea.

The Defendant entered a guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970). In Tennessee, a defendant may enter a "best interest" or *Alford* guilty plea in which he or she maintains innocence but, having concluded that entry of a guilty plea is in his or her best interest, consents to the imposition of a sentence. *Frazier v. State*, 495 S.W.3d 246, 250 n.1 (Tenn. 2016); *State v. Williams*, 851 S.W.2d 828, 830 (Tenn. Crim. App. 1992). Before accepting the plea, the trial court must determine that there is a factual basis for the plea. *Dortch v. State*, 705 S.W.2d 687, 689 (Tenn. Crim. App. 1985).

A defendant is not required to admit guilt with respect to a crime in order to qualify for diversion. *Stanton*, 395 S.W.3d at 688. "[T]he failure of the defendant to admit guilt is not, in and of itself, a proper basis for denying diversion." *State v. Oakes*, 269 S.W.3d 574, 578 (Tenn. Crim. App. 2006). "However, there is a critical distinction between confessing guilt to a crime and accepting responsibility for wrongful conduct. Admitting that one's conduct complies with the elements of a criminal offense and accepting responsibility for wrongful conduct are not necessarily synonymous." *Stanton*, 395 S.W.3d at 688-89. The failure to admit any wrongdoing or accept any responsibility is a relevant consideration to the denial of diversion. *Id.* at 689. This factor is "relevant in assessing a defendant's amenability to correction and whether pretrial diversion will satisfy the need for deterrence and serve the ends of justice." *Id.* *Stanton* discussed the consideration of this factor in the context of pretrial diversion, where the defendant has not yet entered any sort of a guilty plea to a crime. *Id.* at 689 n.3 (concluding that "courts should carefully review pretrial diversion applications in light of the circumstances of each case to ensure that the acceptance of responsibility does not amount to a requirement of admitting guilt"). We conclude that if consideration of this factor is acceptable in the context of pretrial diversion, then it is also permissible for judicial diversion, where a plea has already been entered and the trial court is in the process of sentencing the defendant. As part of her *Alford* plea, the Defendant acknowledged that the State's case was sufficiently strong that entering the plea would be in her best interest. We conclude that under *Stanton*, the trial court did not err in its consideration of the Defendant's failure to acknowledge wrongdoing after entering an *Alford* plea.

## II. Improper Evidence

The Defendant argues that the trial court erred in considering inadmissible hearsay and considering evidence outside the record of the proceedings, in particular evidence regarding the assault incident, evidence regarding the Commission meeting, and evidence regarding her mental health. The State counters that the Defendant was provided with,

and availed herself of, the opportunity to respond to these issues and that they were therefore properly before the court. It also asserts that the trial court could take "judicial notice of highly publicized events of general knowledge," such as the assault and the County Commission meeting. We conclude that the trial court's decision clearly relied on, and granted great weight to, evidence which was not properly introduced into the record. The trial court's sentencing determinations appear to have been at least in part made by consulting the judge's own memory of television news accounts of the two confrontations, and the trial judge's determinations regarding the Defendant's mental health were based on speculation rather than the evidence presented at the hearing. We conclude that the trial court abused its discretion in denying diversion.

## A. Waiver

The State argues that the Defendant is not entitled to relief because she introduced proof regarding the assault and County Commission meeting. We regard the State's argument that any error was cured by the Defendant choosing to give additional testimony at several points in the sentencing hearing as grounded in waiver. An appellate court need not grant relief to a party "who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). The State's argument appears to be that, by failing to stand by her objection and instead acquiescing in a discussion of the matters which she asserts should not have been considered as outside the record, she waived the objection. *See State v. John Joseph Vengrin*, No. W1999-01512-CCA-R3-CD, 2000 WL 1670933, at *3 (Tenn. Crim. App. Oct. 25, 2000) (concluding that the defendant, who not only failed to object to trial court's reliance on co-defendant's trial for factual findings but advocated that the trial court make factual findings based on the co-defendant's trial, had waived the issue of reliance on extraneous evidence). However, the Defendant here, unlike the defendant in *John Joseph Vengrin*, did not ask the trial court to rely on matters outside the record. Instead, the Defendant objected to the trial court's consideration of earlier, unspecified news reports detailing the events of the assault and the County Commission meeting. Neither video cited by the trial court was ever introduced into evidence either by the defense or the State, but the trial court continued to rely on its recollection of news stories and videos broadcast on the news. The Defendant was in the process of being sentenced by a court that had made several references to facts that were not introduced into evidence at the hearing. She attempted to introduce her testimony to try to contest some of the factual conclusions the trial court was making based on the judge's personal recollections of news reports. We do not think that, by stopping to respond to the trial court's factual assertions based on events outside the record—assertions on which the trial court was relying in imposing a sentence—that the Defendant waived her objection to the consideration of matters outside the record. In *Vaughn v. Shelby Williams of Tennessee, Inc.*, the trial court relied on its own observation of the plaintiff outside the

courtroom in making a disability award. 813 S.W.2d 132, 133 (Tenn. 1991). The Tennessee Supreme Court concluded that this was reversible error, in part because the parties could not cross-examine the court or offer rebuttal to the judge's observations. *Id.* at 134. The court noted that basing a judicial decision on the trial judge's personal observations was in part improper because "the parties should have the opportunity to cross-examine in order to impeach the source of the evidence or otherwise persuade an impartial trier of fact that the court's observations are, for whatever reason, inaccurate." *Id.* Here, the Defendant was likewise unable to challenge the trial court's factual findings. We conclude that the Defendant has not waived the issue.

## B. Judicial Notice

The State next argues that the trial court correctly took judicial notice of the facts at issue. A trial court should not "'assume facts not in the record, base a sentence on extraneous facts, or take judicial notice of facts not available to this court nor included in the record transmitted to this court.'" *State v. Nunley*, 22 S.W.3d 282, 287 (Tenn. Crim. App. 1999) (quoting *State v. Smith,* 735 S.W.2d 859, 864 (Tenn. Crim. App. 1987)) (relying on the fact that appellate courts review sentences de novo as a rationale). The statute requires the trial court to consider, in determining an appropriate sentence: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). Furthermore, "[a] sentence must be based on evidence in the record of the trial, the sentencing hearing, the presentence report and the record of prior felony convictions filed by the district attorney general with the court." T.C.A. § 40-35-210(f); *see State v. Dowdy*, 894 S.W.2d 301, 305 n.4 (Tenn. Crim. App. 1994); *Smith*, 735 S.W.2d at 864. The Defendant was sentenced to probation, and the trial court was required to base its decision on these elements. *Cf. King*, 432 S.W.3d at 324-25 (noting that diversion is technically not a sentence but that a decision regarding diversion determines whether to impose or defer a sentence and is therefore governed by the appellate standards set forth in *Bise*).

"'[It] is inappropriate and, generally, reversible error, for a fact finder, to base a decision on observations outside the particular judicial proceeding.'" *Nielsen Bainbridge, LLC v. Thomas Shinn*, No. M2008-01639-WC-R3-WC, 2010 WL 153041, at *4 & n.3 (Tenn. Workers' Comp. Panel Jan. 15, 2010) (quoting *Blackwood v. Berkline Corp.*, No. 01S01-9609-CV-00190, 1997 WL 271700, at *2 (Tenn. 1997)) (concluding

that trial court had erred in making a credibility determination based on expert's past testimony, but noting that error did not affect analysis on de novo review).  This is because a "trial court's extrajudicial observations are not the proper basis for sentencing." *State v. Shani Carr*, No. M2002-02261-CCA-R3-CD, 2003 WL 1018142, at *4 (Tenn. Crim. App. Mar. 11, 2003) (noting that the judge's observations that drug offenses are "cyclical" and that methamphetamine is one of the more dangerous drugs came from personal knowledge and could not be the basis of sentencing determinations).  In *Vaughn v. Shelby Williams of Tennessee, Inc.*, when the trial judge made a decision regarding disability in part based on his own observation of the plaintiff at various locations outside the courtroom, the Tennessee Supreme Court concluded that it was error for a judge to base a decision on personal knowledge rather than facts introduced through the legal process.  *Vaughn*, 813 S.W.2d at 133.  "In other words, '[i]t matters not what is known to the judge personally if it is not known to him in his official capacity.'"  *Id.* (quoting *Galbreath v. Nolan*, 429 S.W.2d 447, 450 (Tenn. Ct. App. 1967)).  The Court went on to hold that the judge could not permissibly investigate a case or become a source of evidence.  *Id.* at 133-34.  In *State v. Raines*, the court likewise based a finding that the victim was frail and small on the judge's own observation outside of court.  *State v. Raines*, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994).  This court noted that "[t]his violated the rules of evidence because he could not take judicial notice of this fact.  Moreover, these facts were not introduced into evidence, and, therefore, were not a part of the record in this case."  *Id.*

However, facts outside the record may be considered by the court if they are subject to judicial notice.  *Nunley*, 22 S.W.3d at 288; *see also* Tenn. R. App. P. 13(c) (noting that "Court of Criminal Appeals may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed").  Judicial notice is in essence "an acceptance by a court, 'for purposes of convenience and without requiring ... proof, of a well-known and indisputable fact.'"  *State v. Lawson*, 291 S.W.3d 864, 868 (Tenn. 2009) (quoting *Black's Law Dictionary* 863-64 (8th ed. 2004)).  Judicial notice allows the parties and the court to dispense with the necessity of introducing evidence.  *Counts v. Bryan*, 182 S.W.3d 288, 291 (Tenn. Ct. App. 2005).  Judicially noticed facts are given the same weight as facts established by evidence introduced at the hearing.  *Nunley*, 22 S.W.3d at 288.  "'Facts which are universally known may be judicially noticed provided they are of such universal notoriety and so generally understood that they may be regarded as forming a part of the common knowledge of every person.'"  *Pemberton v. Am. Distilled Spirits Co.*, 664 S.W.2d 690, 693 (Tenn. 1984) (quoting *Standard Life Ins. Co. v. Strong*, 89 S.W.2d 367 424 (1935)).

Tennessee Rule of Evidence 201 governs judicial notice.  Any court may take judicial notice of an "adjudicative fact" if it is of a kind "not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the

trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(a), (b). An adjudicative fact is one that is relevant to a specific lawsuit and to which the law is applied in the process of adjudication. *Counts*, 182 S.W.3d at 292. When a party offers "anything other than dilatory or pretextual reasons" to oppose taking judicial notice, the fact becomes subject to reasonable dispute and the court should not take judicial notice of it. *Nunley*, 22 S.W.3d at 288 (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence* 44 (3d ed. 1995)).

Accordingly, verifiable facts, such as those included in the court's own records, are subject to judicial notice. *Harris v. State*, 301 S.W.3d 141, 147 n.4 (Tenn. 2010). "Facts relating to the operation of the courts, matters occurring within the immediate trial or appeal, or developments in a prior trial or prior proceedings all have been subject to judicial notice." *Lawson*, 291 S.W.3d at 869. "[F]acts in the form of books and reports, and of rules of arbitration" have also been subject to judicial notice. *Counts*, 182 S.W.3d at 292; *see also Victoria Haynes v. Benton Ned Bass*, No. W2015-01192-COA-R3-CV, 2016 WL 3351365, at *4-5 (Tenn. Ct. App. June 9, 2016) (orders related to divorce in another state were subject to judicial notice).

Facts which are not generally known are, on the other hand, not subject to judicial notice. *Vaughn*, 813 S.W.2d at 133 n.2 ("It is not appropriate to judicially notice facts that are beyond the scope of the knowledge of the general public, but are known instead to the judge through his personal, extrajudicial, experience."); *Smith v. State*, 354 S.W.2d 450, 452 (Tenn. 1961) (refusing to take judicial notice that the homicide on appeal was given a great deal of local publicity); *Highfill v. Baptist Hosp., Inc.*, 819 S.W.2d 436, 439 (Tenn. Ct. App. 1991) (concluding that judicial notice was inappropriate for "[t]he effects upon a beholder of an unseemly display of affection" in a tort action); *Williams v. Linkscorp Tennessee Six, L.L.C.*, 212 S.W.3d 293, 298 (Tenn. Ct. App. 2006) (Farmer, J., dissenting) (asserting that the rate of growth for algae, moss, or mildew was not subject to judicial notice); *John Joseph Vengrin*, 2000 WL 1670933, at *2 ("However, we have held that a trial court errs by basing its sentencing determination on judicial notice of evidence presented in a separate proceeding."); *State v. Dowdy*, 894 S.W.2d 301, 305 n.4 (Tenn. Crim. App. 1994) (concluding that problems within the community were not properly subject to judicial notice in making a determination regarding deterrent value); *State v. Young*, 617 S.W.2d 661, 663 (Tenn. Crim. App. 1981) (judicial notice of the location of a city in a particular county, when the city lay in more than one county, was not proper, and appellate court refused to take judicial notice of the location of a particular street in that city).

Here, the State argues that the trial court properly took judicial notice of the content of what was apparently intensive media coverage of both the County Commission

meeting and the alleged assault committed by the Defendant. This court has previously held that in a trial, "Rule 201 does not permit a trial court to take judicial notice of hearsay statements contained in the newspaper articles." *State v. George E. Martin, Jr.*, No. 02C01-9512-CC-00389, 1997 WL 471158, at \*6 (Tenn. Crim. App. Aug. 18, 1997). In *Martin*, the defendant sought to question the chain of custody and requested the court to take judicial notice of newspaper articles stating that the evidence vault had been subject to tampering. *Id.* at \*5. This court noted that "[i]nformation contained in a newspaper article is not capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned," and that the hearsay statements would be inadmissible at trial. *Id.* at \*6 (quotation omitted). The Tennessee Supreme Court cited this opinion with approval in *State v. Henretta*, 325 S.W.3d 112, 144 (Tenn. 2010), concluding that the Rule does not allow judicial notice of hearsay contained in newspaper articles. In *Indiana State Dist. Council of Laborers v. Brukardt*, the Tennessee Court of Appeals likewise noted that "self-generated press releases and other news articles are not subject to judicial notice under Tenn. R. Evid. 201, nor are they otherwise admissible for the truth of the matter asserted." *Indiana State Dist. Council of Laborers v. Brukardt*, No. M2007-02271-COA-R3-CV, 2009 WL 426237, at \*9 (Tenn. Ct. App. Feb. 19, 2009); *see also First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, No. E2012-01422-COA-R3-CV, 2013 WL 4472514, at \*17 (Tenn. Ct. App. Aug. 20, 2013), *remanded for reconsideration* (Tenn. Feb. 12, 2014) ("The trial court in this case considered and relied upon newspaper articles, which were not subject to judicial notice."); *but see Energy Automation Sys. v. Saxton*, 618 F. Supp. 2d 807, 810 n.1 (M.D. Tenn. 2009) (citing *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.,* 387 F.3d 468, 472, n. 1 (6th Cir. 2004)) (concluding a court may take judicial notice of the contents of an internet website).

We note that the court here was taking judicial notice in a sentencing hearing. At sentencing, "reliable hearsay, including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted." T.C.A. § 40-35-209(b). While the cases above are in some part based on the fact that judicial notice of the contents of a newspaper article is impermissible because it would contain hearsay, they also assert that the content of a newspaper article is "not capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."[2] We proceed under the principles outlined above to determine in each instance of alleged error whether the trial court relied on permissible evidence in its sentencing considerations.

---

[2] We note that it is possible that the existence of a newspaper article, as opposed to its contents, may be readily verifiable.

-19-

## C. Application of Judicial Notice to the Trial Court's Reliance on Facts Outside the Record

### 1. Assault

The Defendant asserts that the trial court's analysis of the assault incident impermissibly relied on facts outside the record and that the trial court raised the assault issue sua sponte. The State counters that the trial court properly assessed the assault as part of the Defendant's criminal record.[3]

The record shows that, in looking at the presentence report, the trial court initially noted that the report was "unusual." The State agreed, informing the court that the factual basis for the plea was not in the report and that it had asked the Defendant to stipulate to the facts in its Statement of Undisputed facts for this reason. The trial court then noted the absence of the arrest for assault. The State responded by declaring that the assault charge had been dismissed as part of the plea in this case, and the prosecutor gave a bare-bones account of the incident in which he stated that the Defendant threw water from a bottle on the victim after an argument and that there were no injuries.

At this point, the trial court made several observations that were based on its recollection of the events as reported in the media. The trial court referenced a "bizarre" incident, which it confirmed was the assault. The trial court then referenced the Defendant's alleged racial remark during the assault and also referred to the bystander's photos. Neither party had introduced any evidence regarding the details of the assault or the presence of a bystander. The trial court also disputed defense counsel's description of the video, stating, "That's not what I remember." The Defendant testified that she was attempting to defend herself against a woman who had backed onto the curb and into the tree three times and then spit on her for a perceived parking slight. The State read the bystander's account into the record. The trial court again referenced its own recollection of the video, noting "if I recall correctly from last summer the video showed water being thrown."

---

[3] We observe that the arrest constitutes part of the Defendant's social history even if it does not constitute part of her "criminal record." *See State v. Daryl Madden*, No. 87-30-III, 1987 WL 12057, at *2 (Tenn. Crim. App. June 10, 1987) ("While arrests obviously do not constitute a 'criminal record,' they do comprise his 'social history.'"); *State v. Halbert B. Dodd II*, No. W2008-01484-CCA-R9-CD, 2009 WL 2501996, at *5 (Tenn. Crim. App. Aug. 17, 2009) (noting that arrest should not be "misunderstood" to be part of defendant's "criminal record" but could be considered in evaluation of social history, mental condition, and best interest of the public); *but see State v. Mark Deven Dover*, No. E2014-01558-CCA-R3-CD, 2015 WL 3492155, at *2, 5 (Tenn. Crim. App. June 3, 2015) (trial court relied on arrests in analyzing defendant's criminal record).

Defense counsel objected to the trial court's reliance on the video as hearsay, noting that he did not recall the contents of the video but believed it showed a security guard telling the victim to calm down. He also noted that, as the case had been dismissed, he had not had a chance to interview the witness who took the video recording. During closing argument, counsel also noted that the only witness who was present at the hearing was the Defendant, and that the allegedly disinterested witness was not subject to cross-examination. T.C.A. § 40-35-209(b) (allowing hearsay if the defendant has a "fair opportunity to rebut" the evidence).

We note initially that it was not improper for the trial court to inquire into the details of an assault charge which was dismissed as part of the plea agreement.[4] The trial court is required to consider the social history of the accused and circumstances of the offense in its decision regarding diversion. Accordingly, the factual basis of a charge dismissed as part of the plea agreement may be relevant to the trial court's analysis regarding diversion.

However, the trial court did not limit its actions to asking the State to introduce evidence on the assault allegation. Instead, it relied on its own recollection of the incident from news reports, disputing the defense's assertion that the video showed a security guard asking the victim to step away by stating, "That's not what I remember." The judge also stated she recalled a video recording of "water being thrown." In imposing the sentence, the judge stated that the Defendant had been "caught on video[]tape fighting with somebody." The trial judge observed that her "immediate thought when I saw that on the news that night" was "what is going on with Henri Brooks" and stated that the judge felt "embarrassed" for the Defendant.

The trial judge's reliance on her own memory of media reports regarding the incident was improper. First, we conclude that the events are not subject to judicial notice. As noted above, newspaper articles are generally composed of hearsay statements. While reliable hearsay may be admissible at sentencing, provided the defendant is provided an opportunity to rebut it, it is impossible in this situation to evaluate whether the hearsay statements in the news reports here are reliable because the court did not cite to any particular source but relied on its own recollection of whatever media exposure was given to the incident. The video itself was never introduced into evidence. Moreover, caselaw suggests that "a newspaper article is not capable of accurate and ready determination by resort to sources whose accuracy cannot be

---

[4] While the technical record, which includes only the petition for acceptance of a guilty plea, order on guilty plea and judgment document, does not reflect that this charge was part of the plea agreement, the Defendant did not dispute that it was settled as part of the Defendant's *Alford* plea to the charge of making a false entry on an election document.

questioned," and its contents are accordingly not properly the subject of judicial notice. *George E. Martin, Jr.*, 1997 WL 471158, at *6 (quotation omitted).

The State, at oral argument, asserted that the trial court did not rely on this incident in denying diversion, but instead found the Defendant's refusal to accept responsibility determinative. However, the trial court engaged in an extensive discussion of this topic, ultimately stating that it was "leaning against diversion based on this whole craziness, the car." The trial court had an obligation to act as a neutral observer and could not rely on extrajudicial facts in making its determinations. *Vaughn*, 813 S.W.2d at 133. We conclude that the trial court relied on improper evidence in assessing the Defendant's social history regarding the assault.

## 2. County Commission Meeting

The Defendant also asserts that the trial court relied on improper evidence in considering her social history when it sua sponte referenced the events of a County Commission meeting where the Defendant apparently launched a tirade against a Hispanic man regarding eligibility to bid on minority contracts.

The trial court made one passing reference to the County Commission meeting during the sentencing hearing in the context of focusing on the Defendant's mental health and the assault incident; neither party pursued this reference or introduced proof regarding the meeting. In pronouncing the sentence, the trial court then referenced the incident in further detail, noting that while the Defendant had fought for her African-American constituents, "God help the Hispanic Americans as we heard last year her blast a man that was looking for assistance. She gave him an ear[ful] that just sent chills down my spine." The trial court announced that it was denying diversion. Defense counsel stated that he wanted to "make a record" to the effect that the "State didn't put on any proof" of the encounter at the Commission meeting, and that the Defendant had had no opportunity to respond. The trial court then permitted the Defendant to put on proof regarding the events of the meeting.

In its brief, the State argues that the trial court could consider the Defendant's statements in the context of her social history and that the meeting was properly the subject of judicial notice. As we noted above, the video of this incident, which apparently received extensive media coverage, was not introduced into the proof. The Defendant testified that she was responding to off-camera comments from her fellow Commissioners regarding a topic that had been hotly contested on numerous occasions, and she stated that she had apologized for her comments to the Hispanic man. The Defendant stated that she had said that the two racial groups were not comparable because of a history of enslavement. The trial court apparently relied on its own

recollection of media accounts of the incident, and these accounts are not "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned," and may not be admitted through judicial notice. Tenn. R. Evid. 201(b); *George E. Martin, Jr.*, 1997 WL 471158, at *6. The trial court's reliance on this evidence was in error.

Because we conclude that the Defendant's remarks at the Commission meeting were not properly before the court, we do not address the Defendant's argument that consideration of her statements was a violation of her First Amendment rights. "It is well-settled in Tennessee that 'courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties.'" *Waters v. Farr,* 291 S.W.3d 873, 882 (Tenn. 2009) (quoting *State v. Taylor,* 70 S.W.3d 717, 720 (Tenn. 2002)).


### 3. The Defendant's Mental Health

The Defendant also asserts that the trial court relied on improper evidence in concluding that her mental health was compromised. The State counters that the Defendant put her mental health at issue by introducing it through testimony from her witnesses.

Defense counsel asked several of the Defendant's witnesses regarding her mental and physical health, and they testified that the Defendant did not have any mental health problems. The trial court is required to consider the accused's mental and physical health in determining whether diversion is appropriate. *Electroplating, Inc.*, 990 S.W.2d at 229. Considering the Defendant's mental health as a factor was appropriate.

However, the trial court did not rely on either the State's or the Defendant's evidence in making its determinations regarding the Defendant's mental health. Instead, after referring to evidence outside the record regarding the assault, the trial court stated its belief that the Defendant had "some mental issues," referring, for the first time, to the County Commission meeting, the parking lot incident, and "stalking."[5] The court noted it was "leaning against diversion based on this whole craziness, the car." The judge stated, "I can't believe she's not at least bipolar, probably more than that." The trial judge acknowledged that she was not a "licensed psychologist," but nevertheless concluded that the Defendant had "rage issues." When trial counsel stated that the Defendant may not

---

[5] We note again that the record is unclear regarding this incident, in part because it appears that the Defendant exhibited some documents to the trial court which were not introduced into evidence.

-23-

have acted in a "tactful" manner but that there was nothing in the record to indicate she had harmed anyone, the trial court responded, "She may be paranoid schizophrenic."

The Defendant cites to *State v. Chyanne Elizabeth Gobble*, No. E2014-01596-CCA-R3-CD, slip op. (Tenn. Crim. App., Aug. 12, 2015) for the proposition that giving great weight to an improper factor is grounds for reversal. In *Chyanne Elizabeth Gobble*, the trial court denied diversion in large part based on its opinion that the defendant should have been charged with vehicular homicide rather than leaving the scene of an accident resulting in death. *Id.* at *12. This court reversed and granted diversion on a de novo review. *Id.* at *14. In *Chyanne Elizabeth Gobble*, however, the trial court erred in weighing an irrelevant factor: the crime the trial court believed the defendant should have been charged with. *Id.*

Here the trial court analyzed a relevant factor—the Defendant's mental health—but relied on extraneous evidence and on expertise it acknowledged it lacked. "'[It] is inappropriate and, generally, reversible error, for a fact finder, to base a decision on observations outside the particular judicial proceeding.'" *Nielsen Bainbridge*, 2010 WL 153041, at *4 & n.3 (quoting *Blackwood*, 1997 WL 271700, at *2). The trial court had a duty to function as a neutral and detached observer rather than a witness. *See Lawson*, 291 S.W.3d at 869 n.5 ("A decision may not be based upon the personal knowledge of the judge, but only upon the facts learned by virtue of the legal procedures in which the judge plays a neutral role."). Instead, the trial court based its determinations about the Defendant's mental health based on its recollection of news accounts of the assault and the Commission meeting. We conclude that the trial court's reliance on extraneous evidence in evaluating the Defendant's mental health was improper.

### D. Evidence Supporting the Trial Court's Findings

At oral argument, the State ultimately conceded that the trial court erred in considering statements made at the County Commission meeting, but argued that the denial of diversion was not based on these statements and that the trial court at worst found the Defendant's social history to be "a wash." We have concluded that the trial court's findings regarding the County Commission meeting and the assault, as part of the Defendant's social history, and its findings regarding the Defendant's mental health were all predicated on improper evidence. This improper evidence was used in the trial court's evaluation of the Defendant's amenability to correction, her criminal record, her social history, and her mental health.

Without the evidence outside the record, some of the trial court's conclusions were not supported by "any substantial evidence." In particular, the trial court's conclusion that the Defendant's social history did not weigh in her favor was based on improper

considerations because the State failed to introduce any evidence at all regarding the meeting into the record. Likewise, the trial court's conclusions about the Defendant's mental health and other findings regarding the assault were based on the court's improper consideration of facts within the trial judge's extrajudicial observations and personal knowledge. These incidents should only have been considered insofar as the State introduced proof regarding them into the record. Moreover, even if we were to consider the evidence that the Defendant threw water on a woman, either for confronting her about a "stolen" parking spot or for spitting on her, and that the Defendant went on a tirade against a Hispanic man regarding the eligibility of different minorities to bid on certain county contracts, we cannot say that there is "any substantial evidence" to support the conclusion that the Defendant is mentally ill. We note that we disagree with the trial court's description of the assault incident as indicative of "rage issues." From the proof in the appellate record, it appears that the Defendant took a parking spot which the victim believed was rightfully hers. The victim then backed her car a few feet past the curb, onto the grass, and into a small tree. The victim apparently felt that she was forced to drive a few feet past the curb and into a tree by the Defendant's actions. The victim confronted the Defendant, who made a remark about the victim's race and threw water on the victim during the course of the confrontation. A bystander told police that the victim called the Defendant the devil and herself a "child of God." While the Defendant perhaps did not demonstrate good judgment as a public figure in her actions, these events do not establish any mental illness, much less a serious condition such as bipolar disorder or paranoid schizophrenia. We conclude that the court gave undue consideration to the improper evidence, apparently basing its decision in a large part on the court's recollection of news accounts of the assault and news accounts concerning the statement made by the Defendant during the Commission meeting. *Compare Stanton*, 395 S.W.3d at 687 n.2 & 691 (holding there was no abuse of discretion when the denial of pretrial diversion considered an irrelevant factor but did not give it undue consideration).

Based on the trial court's impermissible and heavy reliance on facts not in evidence, we conclude that the trial court abused its discretion, as the record lacks any substantial evidence to support its findings. *King*, 432 S.W.3d at 327 (citing *State v. Curry*, 988 S.W.2d 153, 158 (Tenn. 1999) for the proposition that the absence of any substantial evidence in the record constitutes an abuse of discretion).

### III. Remand and Recusal

Having concluded that the trial court abused its discretion, we must decide whether to review the decision de novo or to remand to the trial court for reconsideration. *King*, 432 S.W.3d at 328. We consider the adequacy of the record, the fact-intensive nature of the inquiry, and our ability and need to request supplementation. *Id.*

We conclude that, considering the multiple disputes surrounding the facts introduced at the sentencing hearing, the better course in this case is to remand for a new sentencing hearing. In the event of a remand, the Defendant has requested that we remand with instructions for the trial judge to recuse herself.

A judge presiding at a trial "must be sufficiently neutral and free of preconceptions about the factual issues to be able to render a fair decision." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (quoting Charles W. Wolfram, *Modern Legal Ethics* 988 (1986)). Recusal may be merited when the judge's conclusions "'stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from ... participation in the case.'" *Id.* at 821 (quoting *State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692, 697 (Mo. Ct. App. 1990)). Bias may be present when a judge has expressed an opinion on the merits of a case prior to hearing evidence, has taken a position favorable or unfavorable to a party prior to a hearing, or has prejudged factual issues. *Id.* at 822. A trial judge may be disqualified for an appearance of bias whether or not actual bias exists, because the appearance of bias is injurious to the integrity of the legal system. *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564-65 (Tenn. 2001). We conclude that, given the extrajudicial facts considered at the sentencing hearing, the appearance of impartiality is best preserved by instructing the trial judge to recuse herself and allowing the hearing to proceed under a new judge on remand.

## CONCLUSION

We reverse the trial court's denial of judicial diversion, and we remand for further proceedings in accordance with this opinion.

_____
JOHN EVERETT WILLIAMS, JUDGE